for the second district is now open. The Honorable Justice Joseph E. Burkett presiding, along with Justice Susan S. Hutchinson and Justice Mary Shostak. The case this morning is number 2-170932, People of the State of Illinois, Plaintiff-Appellee v. Aremis Hatch, Defendant-Appellant. Arguing for the appellant, Christopher McCoy. Arguing for the attorney, Richard S. London. Are you ready to go? Justice Burkett, are you muted? Justice Burkett? Okay, Justice Burkett, go ahead. Mr. McCoy, you may proceed. May it please the court, counsel, my name is Christopher McCoy, and I represent Mr. Aremis Hatch. In our brief, we raised three issues, and today I would like to focus on the first two, being the suppression issue in the non-resident exception, the Foyd and multiple constitutional and statutory interpretation issues at play. Yet the dispositive principle in this case is really, and that is this, that post-Aguilar, simply seeing a person in possession of a firearm does not create probable cause to arrest. Yet, in this case, after seeing Mr. Hatch in possession of a firearm, the officers immediately arrested him. At that point, they knew nothing about Mr. Hatch. They did not even know his name, and as both admitted, they did not know if he possessed the gun legally. For these reasons, a motion to suppress would have been granted had one been filed, and trial counsel was ineffective for failing to file such a motion. Now, in response, the state in its brief focuses heavily on officer safety, and we are not trying to diminish those safety concerns in any way. However, the legislature has provided tools for officers to deal with these safety concerns. Specifically, during an investigative stop, officers can request proof of a concealed carry license, they can request to know the location of a concealed firearm, and they can secure the gun for the duration of the stop. In this case, the problem was that the officers did not use these tools. Instead, they immediately arrested Mr. Hatch and conducted no further investigation. Now, if the state is correct, and these generalized safety concerns are sufficient to warrant an arrest, the end result, officers could arrest anyone they saw in possession of firearms, and because every firearm to some degree represents a safety threat, it would make the statute I just talked about regarding what officers can request completely subversive. It would also arrest first, determine licensure later method of policing that has been condemned by multiple courts. So, really what the state is arguing for here is the ability for officers to arrest anyone that has been in possession of a firearm. Now, there may be some cases where there are heightened safety concerns, which would justify immediately handcuffing a defendant. For example, if the defendant was reaching for a firearm, or if he was being particularly non-compliant with officer's orders, or there's a hostile crowd gathered at the scene, all of these factors could in some circumstances perhaps warrant handcuffing the defendant. But none of those facts occurred in this case. And what we have here again is merely the sight of the firearm, and the police immediately handcuffing the defendant without doing any further investigation. Now, the state focuses on two other factors in an attempt to show probable cause. The first is the defendant's statement. However, these statements were made after he was already arrested and in the back of the squad car. So, they do not back the cause analogy. The second factor the state points to is the alleged bullet holes in the car. But there are simply too many unknowns in regards to this. Officers did not even know if these were bullet holes. They did not know when they had been made, who had made them, and they certainly did not know if they were connected to the gun in any way. And ultimately, holes in a windshield don't say anything about whether or not the defendant possessed the gun legally. There's no other factors to support probable cause in this case either. There's no fleeing, no false statements. Mr. Hatch did not resist arrest. In fact, he complied with all of the police officer's orders. So, therefore, there was no probable cause here. A motion to suppress would have been successful. And without the suppressed evidence, the state could not sustain its burden of proof. So, therefore, Mr. Hatch's convictions should be reversed outright. And as I was saying at the beginning, this is as far, really, as this court needs to go in this case. If this court agrees with us on our Argument 1, there's no need for it to address Argument 2. Of course, if this court does disagree with us on the suppression issue and addresses Argument 2, Mr. Hatch's convictions should still be reversed based on the non-resident exceptions to the FOIA and concealed carryout. And I'd like to begin the statutory interpretation part of this argument focusing on Count 2, which is the count premised on the lack of a FOIA card. And the real question with this count is whether or not the non-resident exception requires a physical license. And there are two contradicting opinions on this case, Meshaga and Wiggins. We're asking this court to follow Meshaga and find that the non-resident exception applies even without a physical license. Notably, this was the position taken by the Meshaga. And the reason for Meshaga's decision is that the exception says it is for, quote, non-residents who are currently licensed or registered to possess a firearm in their resident state. So as Meshaga found, if licensed means only a physical license, then registered is completely superfluous. In fact, neither Wiggins nor the state in its brief can ever even attempt to offer an explanation for how the word registered would not be superfluous. Instead, Wiggins focused on exception 13, a later exception in the statute, which refers to, quote, non-resident hunters whose state of residence does not require them to be licensed or registered to possess a firearm. Now, there is some superficial appeal to this point as this language is juxtaposed with the language in exception 10. However, the problem is that exception 13 overlaps completely with exception 5. And therefore, it wasn't passed with the other exceptions in mind. And it really doesn't offer much insight into the legislative intent in passing the exception question here. And ultimately, we're faced with a statute where the various subparts cannot be read together as a harmonious whole. Something is always going to be superfluous under either interpretation. So when we have these two competing interpretations, under the rule of lenity, the defendant's interpretation should be adopted. There are two other problems with the Wiggins interpretation. First, as recognized in Meshaga, it would mean that residents of 37 states, including four of the five states that border Illinois, would not be eligible for this exception. And it's not compatible with the Concealed Carry Act under which a non-resident can possess a firearm. So then turning now to count 1, which is the count premise on the lack of a concealed carry license, the state does not even respond regarding this count in its brief. And this count 1 as well does not require proof of a physical license. The key phrase in that count is, quote, as evidence by the possession of a concealed carry license or permit issued by his or her state of residence, if applicable. And it's applicable here because Georgia allows Mr. Hatch to possess a firearm in a vehicle without a interpretation of the Floyd and Concealed Carry Act create constitutional problems. Ultimately, the Second Amendment at its core is designed to protect the right to self-defense. However, if a non-resident from one of these 37 states is traveling through Illinois, they would have to have their gun broken down, unloaded, and encased, in which case it would provide no benefit in terms of self-defense to the non-resident. In fact, the trial court in this case was particularly concerned with this constitutional problem, although ultimately it felt that it was bound by the decision. Therefore, the narrower interpretation of the statute should not be accepted. And this court should find that Mr. Hatch fits into both exceptions to the Floyd and Concealed Carry Act. In conclusion, in Argument 1 or Argument 2, Mr. Hatch respectfully asks that this court reverse his conviction and answer any questions from this court. Justice Hutchinson, your question. Thank you, Justice Burkett. Mr. McCoy, did the officers find out who Mr. Hatch was? When did they ask for his name? It's not entirely clear from the record. It certainly is after he is handcuffed and in the station. Now, you've indicated that one of the appropriate ways to handle this might be to handcuff the person of interest until everything was resolved. So does the handcuffing indicate he was arrested, or does it indicate that they were trying to resolve the issue of the legality of the gun in this case? In this case, it indicates that he was arrested. There could be some other case where handcuffing was done for an investigative purpose. But here, the officers handcuff Mr. Hatch, place him in the back of a squad car, and take him to the station. The handcuffing is not done in furtherance of any investigative purpose in this case. So it really is indicative of an arrest and not just a carry stop. Okay. Now, there is some authority, even though it's pre-AGUILAR, that the officers do not have to request the FOID card prior to taking possession of the gun for purposes of officer safety. Is there anything that says they have to request the FOID card first that's happened since AGUILAR? Well, I'm not sure anything specifically. The case of James Taylor, which we cite in our closest to that, it's held that there was no probable cause that a crime had been committed when police officers did not ask the defendant if he had a FOID card and then seized the firearm for their safety. In fact, James Taylor, that case, it specifically rejects the case that was cited pre-AGUILAR. Okay. And the name of the case that you cited, because I had a slight breakup, what was the name of the case? Is that the People v. James Taylor? Yes. It's 2001. No, I know we've got two Taylors here. Okay. It's actually James Thomas, I think. Okay. There are several cases with the same last name. What about the statements the appellate made during the ride to the station? Don't they lend some information that would indicate that this was a dangerous circumstance for the police officers? Our contention is that those statements were made after the arrest. So, at that point, the sort of post hoc justification does not factor into the probable cause analysis. Okay. Thank you, Mr. McCoy. Justice Burkett, I don't have any other questions at this time. Justice Burkett, I'm going to yield my questions to you at this time, and then I will go after you, if you don't mind. I think we've lost Justice Burkett again. Justice Burkett, is your mute on? Let's pause here again, everyone. If you don't mind. I can hear. Can you hear me now? Yes, we can hear you now. Okay. I don't know what... Jeff has the tape off, so we have to... Go ahead. ...go wherever he is. Okay. All right. Mr. McCoy, can you hear me? Yes. Sorry about these little problems here. Mr. McCoy, the defendant was a resident of Georgia, and his driving record shows numerous traffic tickets between 2015 and his arrest, and he also had a Schomburg address. Is he really a resident of the state of Georgia? Yes, he was a resident of the state of Georgia. He came to Illinois to visit his mother, and while he was in Illinois, unfortunately, picked up a case out of Cook County. Part of the reason for that case was that he was not allowed to leave the state of Illinois during that time. Additionally, the trial court ruling on the motion for new trial did indicate that it found that Mr. Hatch was a resident of Georgia, not of Illinois. I'm having problems hearing you, Mr. McCoy. Okay. I'll start that answer again. Are you able to hear me now? Mr. Hatch was a resident of Georgia. He came to Illinois to visit his mother, and unfortunately, he picked up a Cook County case while he was in this state. One of the bond conditions of that case was that he was not allowed to leave the state of Illinois, and that received other tickets during that time. In fact, the trial court in this case, when ruling on the post-trial motion, specifically found that Mr. Hatch was a resident of Georgia and not a resident of Illinois. Okay. Mr. McCoy, the version of the Georgia statute that you referred to, Section 126D, would seem to indicate that a person can carry a firearm or possess a firearm in a vehicle, in someone else's vehicle, so long as there's permission to do so. However, the former version of that subsection required that the vehicle and that the weapon be carried or be possessed in an open and fully exposed to view or in the glove compartment console or similar compartment of the vehicle. And I'm reading from a version of the statute that's cited in Watkins v. State, which is 304 Georgia Appellate 78, a 2010 case. What version of the statute was in effect at the time of the defendant's arrest? I believe that the statute... Mr. McCoy, you're breaking up. I believe the statute in effect at the time was the statute that did not include that phrase. I don't have the exact date of that Georgia statute in front of me, so I cannot say for certain, but my belief is the version without the language you just cited. Were you familiar with Watkins and the former language when you wrote your brief? We did not cite Watkins in our brief, no. I'm not familiar with that case. Were you familiar with the historical version of the statute before this current statute that you cited in your brief? No, I was not. Because it appears that this current version may have been a response to Watkins and other cases like that. Would you agree that it may require some additional briefing and some discussion about what statute was in effect at the time? Yeah, I would be willing, if this court would like to, I would be willing to do some supplemental briefing on that issue. You're familiar with people versus homes, I take it, correct? Yes. If people versus homes, the Supreme Court discussed the issue of having a permit or license, and the court said so long as there was a license or permit issued by another state, you did not have to have, or a defendant would not have to have the physical license or permit in his possession at the time of the stop, so long as there was one issued by that state. And doesn't that language in homes seem to indicate that they were talking about the physical administration or the physical possession of a license, even though you don't have it in your possession at the time of the stop? I think what's important to remember is what the actual issue was in homes, which in homes, the trial court did not allow the defendant to even offer proof, I believe he was from, the defendant was from Indiana in homes, did not allow the defendant to offer proof of his Indiana license. Equivalent of the FOIA card. The issue there was addressing whether or not that physical license should be admissible, and whether or not exceptions to the FOIA card should be read into the AUUW statute. So because the issue there was solely related to whether or not a physical license was admissible at trial, the court in homes did not have the chance whether or not a physical license was required in all cases. But just that it could be proof that a defendant fit into the non-resident exception. Let me ask you this. You mentioned that 37 states allow transportation of firearms within a vehicle for essentially self-protection purposes. Are you aware that Georgia has reciprocity agreements with 32 of those other states? I was not aware of that, no. Illinois, by the way, is not one of those states. What effect, if any, does Illinois' decision to decline from joining those reciprocity agreements have on the defendants being in possession of a weapon? When he was stopped. Otherwise, Illinois, that provision. The statutory text, as interpreted in Meshuggah, does not require a physical license. The fact that there is a physical license does not necessarily control how that statute is interpreted. And again, as Meshuggah said, the fact that the legislature included in this exception to the Floyd Act the license or registered, the fact that both of those words are used indicates that a physical license in and of itself is not required. You would agree that the trial court was bound by Wiggins, correct? Because it was an appellate court decision from our state. Correct. The only thing I would say about that is that Wiggins, yes, in general, trial courts are bound by the appellate court's decision. Wiggins didn't completely address the issue here because, as trial counsel pointed out in the court below, Wiggins didn't address the concealed carry act, which is one of the counts Mr. Haas was convicted of. Wiggins also didn't address the federal privileges and immunities clause. So it did not address the exact, precise constitutional question here. But yes, in general, trial courts are bound by a decision of the appellate court. And then let me ask you, finally, the state was never given an opportunity to argue, presuming that the trial court should have granted initially a motion to suppress and shift the The state never had an opportunity to argue the exception of inevitable discovery that the police would have learned that the defendant was not in possession or did not have a license or permit on him when he was issued to him by another state, which they would have determined at the scene of the arrest had they just simply secured the weapon, as you concede that they could have done, correct? The state never was able to argue inevitable discovery. I would agree that the state was not able to argue inevitable discovery, but inevitable discovery. Go ahead and repeat what you're saying. I agree that the state didn't have the opportunity to argue inevitable discovery. However, that doctrine does not apply here. Because the first of all, this was not a carry stop. In fact, this was just a consensual encounter when the officers at that point, the officers did not have any justification for detaining either the driver or Mr. But when they see the firearm, even though this was consensual encounter, a community caretaking issue, when they see the firearm, don't they have the right to secure the weapon for their self-protection for officer safety reasons? Even if they're not in fear, they should secure the weapon until at least they've possessed legally. Well, at the time of this stop, statutorily, they did not have that authority. Under 430 ILCX 6610, at the time of the event, the subsection H was in effect. Later, actually, a few months after this offense in July of 2015, the legislature enacted subsection H1, which allowed for the same type of request, not in an investigative stop, but in any context that a licensee had with an officer. So again, at the time of the stop, the statutory authority, it extended only to investigative stops. It did not extend to consensual encounters. So at the, well, now that may be true, at the time of the stop, the officers did not have that authority. You're saying that the officers did not have the authority to engage in community caretaking before the passage of that section? They had the authority to engage in a consensual encounter, but that authority did not extend to disarming a citizen and seizing a firearm. All right, that's all the questions I have. Justice Shostak. Thank you. I just have a couple of questions. When the window had the bullet hole in it, would that not have been justification for the officer's actions for their safety? No. The, again, the bullet holes themselves tell the officers very little. Again, there's no indication that the officers knew that these were bullet holes when they stopped or when they approached the vehicle. Again, it wasn't a stop at that point. And there's no indication who made them, how they were made, when these holes came into the windshield. And again, ultimately, they said nothing about whether Mr. Hatch legally possessed the firearm. Was there ever any discussion of the bullet holes at trial? Not at trial, no. Okay, thank you. Thank you. Mr. London. Good morning, your honors. May it please the court, counsel. Your honors, the people disagree that defendant was under arrest prior to his statement. This case is sort of highlights the concern that the courts have between the juxtaposition of officer safety and investigation. Contrary to defendant's position, People v. Burns, the case which this court allowed the people to cite as additional authority, makes it clear that the case of People v. Collier is still good law, even in light of Aguilar. More importantly, Burns makes it clear that police are absolutely not required to have a conversation with the defendant about whether he possesses a permit before they react to protect their safety. As the court notes, even a person with a Floyd card and or a concealed carry license can put an officer in danger under certain circumstances. As importantly, in cases such as this, placing a defendant in handcuffs does not transform either a consensual encounter or a Terry stop into an arrest. Those are facts that must be looked at on a case-by-case basis. In this case, as the first officer approached the car, there had been a 911 call regarding a possible stolen vehicle. It was late at night. The car the officer approached was on the street. It was not in a parking spot. I believe it was at a stop sign. But again, it was not in a parking spot. As the officer approached, he heard the female driver saying something along the lines of, yeah, I see an officer approaching. He's just arrived. The officer approaches the car and says, are you the people that made the 911 call? The female driver responds, maybe. Without being there and hearing the tone of that, that in and of itself is a peculiar response, which I think would alert an officer that something weird is going on. If indeed you were the 911 caller and you were still on the line, although I believe that she hung up as the officer approached, why wouldn't you just say, yes, I was? It was late at night, and the people completely disagree with the impact of the bullet holes on the officer's concern. There was not discussion, Justice Shostak, about at trial regarding the bullet holes. There was, though, a pretrial motion relating to that. Defendant would have this court believe that the officer not only should investigate whether or not the gun was possessed legally, but should have investigated in some way that how the bullet holes got there. And again, let's make it clear, the testimony and the evidence was clear that they were bullet holes. An officer does not need to engage in a lengthy discussion about, are those bullet holes? How did it occur? When did it occur? Counsel is correct that they didn't know when those bullet holes occurred or took place. But again, that isn't something that needs to be looked at at that time. The concern is officer safety. Not only Burns, but the cases that defendants cite for the proposition, both Thomas and Spain say the same thing, that officer safety initially is paramount. The people agree that the cases suggest that the courts have cautioned against an arrest first, determine license later approach. However, in each of those cases, the court upheld the police activity. They warned the police that be careful because if the ultimate arrest we find doesn't have probable cause, we're going to suppress the evidence. But in each of those cases, they upheld what the officers did. Actually, in Spain, the court specifically suggested that Mr. Spain's failure to voluntarily produce such a license, even absent the officer's request for it, added to the probable cause to conclude that the possession of the gun was unlawful. The court held that the failure to present when encountered is in itself a factor. It's not determinative, of course, but it's a factor to consider. It was only the dissent, not the majority, that would reverse. The fact in this case definitely allowed the officers to be concerned about their safety and secure the gun and in this case, handcuff the defendant. The evidence then shows that it was either as police were bringing defendant to the squad car or had placed him in the squad car, presumably, although obviously we'll never know, to run his name and investigate further at that time. But when the people argue that defendant was not yet arrested, that defendant engaged in, I won't even call it a statement, but a bizarre diatribe about you've got the right N-word, I carry a gun, everybody carries a gun, this is bullshit. At that point in time, police had every reason to believe defendant was drunk, high, mentally ill, but clearly dangerous and more importantly, combined with the other factors that they had probable cause at that time to believe that defendant did not have either a FOIA card or a license to carry a gun. Moving on to the second issue, Wiggins versus Meshuggah. The first decision in Wiggins actually did conduct a fairly complete analysis, contrary to defendant's suggestion on when and whether a non-Illinois resident is exempt from the FOIA card act. It is true that they did not discuss in that case specifically the concealed carry act, but the exact same analysis would apply. The court found that an actual physical license was necessary and that the federal court's analysis in Meshuggah, the Illinois statute was flawed regarding whether or not a physical license was required. The court actually did go into the concept of a license versus registration and license versus licensure and found that the federal court's analysis under a dictionary definition was inaccurate. As I said, the same analysis would apply to the concealed carry act. As importantly, the court found, as the Illinois Supreme Court had found previously, that the FOIA card act was indeed constitutional. It was not an absolute prohibition on an individual's right to carry a weapon. It was nothing more or less than a regulatory method that almost every state, including Georgia, but Illinois has certainly found relevant and constitutional. In addition, contrary to defendant's position and contrary to Meshuggah, 37 states, it is not accurate to say 37 states do not have a licensing. 37 states might not have a FOIA card type requirement. As far as the people have found, almost every state, and I think Vermont might be the only exception, has some equivalent of concealed carry licensing. So just about every state, including Georgia, does have a concealed carry or, as Georgia calls it, a weapons carry license, which would make that individual exempt. In Wiggins, however, the court found that even though that defendant did have a permit from an army permit, that that wasn't a sufficient state license. The people also note that defendant relies on not a license that the defendant has in Georgia, but rather an exception to the Georgia licensing requirements. The defendant correctly... May I continue? Yes, go ahead. Very briefly, the thought is that while the people agree that they have presented no authority to suggest that the defendant was prohibited from doing so, we did cite in our brief reasons to the people note that defendant relies on subsection D of 1611-126. Justice Burkett, you noted that there is a question as to exactly which form of that was in effect at the time, which the people agree might be appropriate for subsequent briefing. But the people also note that the section that was effective at least in May of 2017, subsection C says that if a person does not have a weapons carry license, and if they carry a handgun, the weapon must be cased and unloaded when carried. While again, further briefing might be necessary, the people suggest that under any of the statutes, even if the exception were to apply, which people don't think should under Wiggins, there is a definite question of whether defendant one would fit under that, and two, how exactly the gun must be, whether it's cased and unloaded, or as your honor suggested, in a glove compartment, but certainly was not the president in this case. I am open for questions. Justice Hutchinson, your questions. Thank you, Justice Burkett. Mr. London, if the people do not agree that the handcuffing and was the arrest without any additional conversation about who are you, what's that gun, et cetera, when do the people believe that the arrest occurred? The people believe the arrest occurred after the defendant's, again, bizarre diatribe. At that point in time, in addition to the concerns of officer safety, at that point in time, there was the reasonable suspicion, articulate suspicion, that we believe that, well, we believe it went from a consensual approach very quickly into a Terry stop, but probable cause occurred after the defendant's statement for what we'll call a statement, because at that time, the officer would have had not only a concern for safety, but reason to believe that the defendant did not possess either a FOIA card or a concealed carry license. Well, at that point, although the statement was a bit odd, he did admit that he because the gun had been taken by the officer. So what does any of that statement say that relates to the legality or illegality of that particular gun? If you look at the, again, the case cited by defendant, People v. Spain, stands for the When a defendant is confronted with the concept of we're arresting you for possessing a gun, the individual actually bears some burden to say, wait a second, I have a license. This is valid. It wasn't just a bizarre statement. It was in the nature of a threat. It wasn't just, I'm admitting I have a gun calmly. It was, you have the right person. I have a gun. I'm reading into the tone of how he said it, but I'm reading into that based on the evidence that was later introduced at sentencing that each time the defendant was strange outburst. So is it specific evidence? Well, of course not. It does not establish in any way beyond a reasonable doubt that the defendant did not have a FOIA card or possess a license, but it was certainly probable cause. And as Justice Burkett pointed out, in the case of People versus Burns, they did discuss not only inevitable discovery, which would have been true in this case, but a good faith exception. And under both a good faith exception and inevitable discovery, once defendant was arrested and brought back for further investigation, it certainly would have been discovered at that time. All right. But good faith certainly at the time of the stop is one thing, but what, if anything, before they actually swore out the complaint, which could be another indication of arrest, did they know about his ability to carry that gun? More importantly, what did they testify to? They testified to very little, to be honest. The testimony was almost exclusively in response to questions by defense counsel, not the people. And the testimony almost completely was based on officer safety concerns. The testimony they did not ask whether or not you swore out the complaint, whether or not they were aware that defendant did or didn't possess a license or FOIA card. They asked whether at the time that you handcuffed him, whether or not they were aware that they possessed a FOIA card. They acknowledged that they were not at that point and none of the case law requires it. Again, the people would suggest that the response to the outburst itself establishes probable cause, especially if you look at the Spain factor that you could take into account defendant's failure to say, listen, you're arresting me for the wrong purposes. I have a license. I have a card. I'm authorized in a foreign state. That was sufficient to establish probable cause for that arrest. Okay. And finally, you indicated that various cases warn in inappropriate terms that officers, of course, we want them to be safe, but we also want them to have probable cause. And the warning is more precise in that it says, and if you do not have probable cause, we will reverse you. So in this case, the issue is failure to file a motion to suppress this evidence as an indication of ineffective assistance of counsel. Why is not the appellant's request to find ineffective assistance appropriate in this case under those warnings? If you look at not only the facts of this case, but if you look at the cases, if you look at Burns, if you look at Coldyer, but if also you look at Thomas and Spain, in each of those cases, the evidence was, I would argue, not even as strong as this case. In Coldyer, you have them just approaching a car. It's a consensual approach. When they find a bullet, that is, you know, then leads to probable cause when they found the gun. Yes, that is Aguilar, but the people would note that Coldyer came down just a few months prior to Aguilar, but the motion to reconsider was denied after Aguilar. That certainly does not suggest directly, but at least implies that Aguilar may have been considered. But more importantly, in Burns and Spain and Thomas, in each of these cases, the evidence that the police had related to those was no stronger, if as strong in this case. In none of those cases prior to arrest, did the police officers ask the defendant whether or not they had a license or, as they can, they did not request the defendant present that license. Yet, under each of those cases, the courts found that the totality of circumstances would have prevented a motion to suppress from being successful. And again, in this case, the driver's initial bizarre, kind of strange response, the bullet holes, and then defendant's not only possession of gun, but his diatribe, we believe would be more than sufficient to establish, plus under Burns, I'm sorry, under Spain, the failure for the defendant to note that he did have a FOIA card or a concealed carry license was sufficient to establish probable cause that defendant did not have either a All right. Thank you, Mr. London. And Justice Burkett, I have no other questions. Justice Sosnick. Yeah, I just have a few brief questions, which I will ask. The whole basis behind this appeal was an ineffective assistance to counsel and failure to file a motion to suppress, correct? Correct. So, if there was a motion to suppress that would have been run, anything made after the initial stop would not have come in at a motion to suppress, correct? So, the statements that you're talking about, the crazy statements that you categorize as crazy, those would not have come in at a motion to suppress, because the whole basis would have been the stop and was there probable cause for the stop? I disagree. Because, again, How so? How so is that the, when you say stop, the initial approach was consensual. The police were responding to a 911 call. The stop changed. So, it was a community caretaking, as you previously said. So, once they get past that community caretaking, how do they go from there? Sure. It very quickly escalated into a stop pursuant to Terry based on, again, the driver's response, the bullet holes, and the officers, and obviously spotting the gun. At that point in time, it was a Terry stop. But what questions were asked to alleviate the fears of the officer or to investigate further pursuant to Terry? Again, as the cases that were cited by both defendant and the people, including Burns, the officer's concerns don't relate necessarily to probable cause. The officer's concerns, the officers aren't required to ask questions before they place a defendant in cuffs and or secure the weapon. At that point in time, it was still a Terry stop. There is no case that says that you must then ask questions before you have probable cause. The people suggest, and again, unfortunately, due to the facts of this case, we don't know whether or not the officer would have. Presumably, and the people's position is the officer was taking defendant to his car to run his name and to determine at that point in time whether or not defendant possessed a void card or had a license and would have asked those questions at that point. He never did. Correct. Because it was at that point, it wasn't back at the station. It was at that point that came out with this bizarre statement. And at that point in time, that was sufficient to establish probable cause for the police to believe that defendant did not have that. The further investigation that led to proof beyond a reasonable doubt was not necessary at that time. That was done later. But yes, we agree completely. The officer never did. The officer never did because the statement transferred the Terry's stop into an arrest and probable cause at that time. Okay, fair enough. So in your brief, you rely heavily on your brief on the sentencing hearing, which again, that's well past beyond what anything would come in in the motion to suppress. Are you relying on that based upon inevitable discovery? Or why are you relying so heavily on the sentencing hearing in this brief? When the issue argued is a stop? Well, again, we rely on the sentencing hearing, not just for the probable cause, we rely on the sentencing hearing for the second issue, which is suggesting that, and again, defendant suggests in the reply brief that the people mentioned all the information in the To the contrary, we rely heavily on the sentencing hearing to suggest that there was more than sufficient evidence to establish that defendant would not fit under the exception to the Georgia rule in that if defendant had mental health issues, drug issues, a offense for fighting. And and again, it is not clear whether that fighting offense that he was convicted of in in Georgia was a misdemeanor or a felony. Those all could have been sufficient to suggest that defendant was a person who was prohibited by law from possessing a firearm. So, but that that's all well and good. If it if Aguilar wasn't present in our system today, isn't it? How do you get past Aguilar with with the reasoning that you have? Again, Aguilar says that you can't completely prohibit an individual from carrying a gun. Aguilar does not say that you cannot put reasonable prohibitions on that. In Georgia, the reasonable prohibition was that you are presented prevented from carrying a gun under certain circumstances, as does Illinois. I mean, Illinois, you cannot obtain either a void card or concealed carry license if you have. And the people would suggest that defendant, if he applied in Illinois, would not have been eligible for either a void card or concealed carry based on his activities. And that's why we highlighted the evidence at sentencing. But what would have also, yes, we do agree that inevitable discovery was relevant and and all of those factors would have been brought out. So, yes, inevitable discovery is a factor. However, I would renew my position that the police did have probable cause. But yes, all of the information that was then garnered would have inevitably been discovered. One last question, which what based upon Aguilar, what is what was the belief that he had committed a crime? What was the crime they believe he had committed? The possession of the weapon? Without, yes, unlawful possession without a void card or a license. Correct. How did they know he didn't have a void card or a license? They never checked. They never asked. Again, did they know? No, they did not. Isn't that what Aguilar reminds us that we need to know? Aguilar doesn't necessarily say that, but each of the cases after Aguilar, again, Burns, definitely Thomas and and Spain say, you definitely it's better to ask. You should ask. However, you can take into account even without and in both Thomas and Spain, the people did not sorry, the people, the police did not ask either of those defendants for a void card or a license did not demand that defendant present that. And Spain, as I said, specifically said the fact that defendant didn't volunteer is a factor to consider. So if this court would choose to overrule both of those cases, they would almost have to do that because, yes, is it better to ask? No question. If the police or the state's attorney were to ask us, we would strongly recommend that that be done. Is it required? Again, Thomas and Spain directly stand for their proposition that no, it is not. You can look at the other circumstances. Defendants diatribes saying everybody has a gun. This is bullshit. Strongly suggest that that the police had reason to believe that he did not have either a Ford car, void card or a license. Did they know for sure that statement was made after they cuffed him and put them put him in the car? Correct. Well, again, I'm not sure of it exactly. It was definitely after they cuffed him. It's unclear whether it was as they were leading him to the car or as he was placed in the car. Yes. However, again, if he was not yet under arrest, but that was still part of the Terry stop. And again, we'll never know. Unfortunately, the people believe that is reasonable that at that point in time they would have run his name, seen if he had warrants, seen if he had, in this case, as the, as was shown, they would have found that he was driving on it. Well, sorry. They probably they'd so you're arguing have that the police would have followed proper procedure eventually. I don't know that. I'm not saying that they definitively would have. I'm saying they may have. We never had that opportunity. I'm suggesting that the two other cases stand for the proposition. The police don't have to ask a defendant before probable cause is established. And that's specifically the defendant's failure to say I have a license is one of the factors to consider. So the statement was further questions. Thank you. Thank you. Thank you, Justice Shostak. Mr. London, let's get down to brass tacks. What were the facts known to the officers at the time of his arrest when they handcuffed him and placed him in a squad car that established probable cause? Beg the question. And again, the question that I'm suggesting you're begging is that once they handcuffed him and placed him in the squad car that he was under arrest. We don't agree. We don't agree with that. And the case law doesn't suggest that people versus burns specifically says that. And both Thomas and Spain imply that handcuffing a defendant who has a gun does not equate to arrest and specifically does not transform a Terry stop into an unlawful arrest. I have several other questions that you've answered. You've answered that question. You're suggesting that the police need not confirm during the course of securing a weapon, whether or not a defendant has a void card or a concealed carry permit. That's your position, correct? Definitely. So they can make the arrest without determining whether or not that firearm is possessed lawfully. That's your position. OK, let me let me just digress one second. Those are two separate questions. One is, can they handcuff them to can they arrest them? Yes, it is my position they can do both. And again, my position is supported by both Thomas and Spain. My position for the first that they can handcuff him is supported by Burns, Collier, Thomas and Spain. My position that they can arrest him is supported by Thomas and Spain. Yes. While it would be better. Mr. London, mere possession of a weapon in and of itself is not probable cause. You agree with that, correct? Correct. So where in Thomas or Spain does it say that mere possession of a weapon or in or fear of a police officer or officer safety reasons justify a full blown arrest? This was a full blown arrest no matter how you cut it, correct? After his statement, yes. Prior to his statement, no. And it was a reference to where he lived. He produced a Georgia driver's license and you refer to it as a rant and even suggested he may have been high or intoxicated. But that it's equally true that it could have just been a protest by somebody who believes that they're unjustifiably arrested, correct? Correct. And that's where Spain comes into play. And Spain specifically says that. The the failure to present a life, a valid license or a FOIA card or suggest that I'm authorized by Georgia in this case is a factor that can be considered. Certainly the mere possession, of course, post Aguilar is not sufficient. However, you look at the totality of the circumstances in each of those other cases. There were other circumstances that the courts found was sufficient for probable cause. In this case, as I have previously explained and as I explained in my brief, the time of night, the bullet holes, the gun and then the diatribe, the common and then the failure to under Spain say that I have a right to possess and carry this weapon. The combination of those are what leads to probable cause, not just the mere possession of a gun. He did argue with the police that where he comes from, he doesn't need to carry a license. Everyone out there has a gun. It's bullshit. The law says I can carry one. It's mine. It's the pistol's mine. He's protesting his arrest and saying where I come from, I can carry or I can possess. It is that the arrest didn't occur until that rant. Certainly when he protests, don't the police have a responsibility to at least evaluate whether or not he might be correct under the laws of Georgia? He did not. Again, with all due respect, Justice Burkett, we don't view that as a protest. We weren't there. We can't hear the tone is used. But but but, you know, looking at the the black, you know, looking at the words, you know, can you view that as a protest? Mm hmm. I don't believe so. I mean, and obviously, you know, you you at least arguably disagree. But but that wasn't a protest and saying, well, under in Georgia, I can do that. It was nothing more or less than saying this is bullshit. I have a right to carry a gun. A right to carry a gun could be nothing more or less than his belief that the Second Amendment allows it regardless of the laws. He certainly did not assert that he fit under the exception to the Illinois law, and he certainly did not exert a right under Georgia law. Obviously, the people don't know, and there's no way of ever knowing. The strong people suspect that this defendant had no clue about the exception to Illinois law or what the Georgia law was, certainly what the exception to the weapons carry Georgia law was, and that this was nothing more or less than a rant. Did you you knew when you wrote your brief that the issue of the merit of a motion to suppress was squarely before us, yet you did not argue in your brief either good faith or inevitable discovery or which version of the Georgia statute was in effect at the time of the defendant's arrest? Why aren't those arguments forfeited in light of the fact that the issue was squarely before this court? Again, that is why we we move to to cite Burns as additional authority and and that raised both the good faith and inevitable discovery concerns as in addition. And as far as the various versions, neither side referenced that. We did go into why we believe that the exception to the rule did not apply in this case. Okay, that's all I have. Thank you, Mr. London. Mr. McCoy. Your honors, I just have a few points regarding the suppression issue. The state admits that there was no probable cause before Mr. Hatch made the statements that he made in this case. And for the first time today, the state argues that at that point, Mr. Hatch was not arrested. The problem was that, again, we can see in some cases, handcuffing, handcuffing does not always equal an arrest. But here, when the defendant is handcuffed, placed in the back of the squad car, and the officers conduct no investigation, that is an arrest and not just a carry stop or a lesser seizure. In fact, the officers here, first of all, they testified that the statements were made when the defendant was in the squad. Mr. McCoy, we're losing you a little bit. The officers testified, the police officers, they testified the statements were made in the squad car. They also testified at that point, they were not asking the defendant any questions. So they were not doing any further investigation. Now, we are not saying that ferns and fangs necessarily overruled. Those cases are both factually distinguishable. We're losing you a little bit, McCoy. Sure. In Burns, the officers, after seeing a traffic violation, smelled cannabis in a vehicle. As the court in Burns said, at that point, they had probable cause to search the defendant. So that is a factual distinction from this case, as well as the fact that there was a carry stop based on the traffic violation, whereas here there was just a consensual encounter. Now, Fane is also factually distinguishable because in that case, there was a safety alert about a gang targeting a rival gang house. And in that case, the defendant was found in the yard immediately next to the targeted house trying to shove a gun in his pocket. Now, one of the factors that Fane did focus on, it wasn't the dispositive factor, but one of the factors was the defendant not volunteering the concealed carry license. However, this court should follow the dissent on that point because the dissent in Fane said that treating this as a factor of probable cause is directly contradictory to the statute, which places the onus on the officers to make the request. And it also puts the Fifth Amendment on its head by penalizing the defendant for exercising his right to remain silent. In fact, even the majority in Fane is not conclusive on this holding. They say that there is a significant risk of suppression if officers do not first ask for... Regarding the bullet holes, we're not saying the officers needed to conduct a lengthy investigation into the bullet holes in this case. In fact, the officers simply needed to ask one question, which is whether or not the officer has legally allowed to possess... We're losing you again, Roy. The final point I will make... You need to speak into the phone. I think you're moving your head and you're moving away from your phone. Okay. Are you able to hear me now? No. Oh, he's calling. The last point I will make is that inevitable discovery here should not apply because it would really incentivize officers to do the arrest first, determine licensure later method of policing, which has been condemned. So at this point, I will respond to any questions that this court has. Justice Hutchinson, any more questions? No, I do not have any. Thank you, Justice Burkett. Justice Shostak, any more questions? No, I have no further questions. Thank you. Thank you, Mr. McCoy. We'll take the case under advisement. The court thanks both parties for their arguments today. The court will discuss, Mr. McCoy, whether or not we're going to request additional briefing, as well as whether or not the state should be allowed to argue good faith or inevitable discovery when those issues were squarely before this court. But again, the case will be taken under advisement. A written decision will be issued in due course. The court thanks both parties for the quality of your arguments this morning. The court stands and recess. Have a good day. Thank you.